IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

PERRY AUSTIN, JR., who sues by and through his )
mother and custodial parent, TIFFANY BENNETT, )
)
Plaintiff, )
) Civil Action Number
vs. ) 00-C-1797-W
)
UNITED STATES OF AMERICA, )
)
Defendant. )

**MEMORANDUM OPINION**

In this case arising under the Federal Tort Claims Act ("FTCA"), Tiffany Bennett, on behalf of her minor son, Perry Austin, Jr., claims that Dr. Anand Pandey breached the standard of care for emergency room physicians in his diagnosis and treatment of the minor, which directly resulted in the child's severe and permanent disability. Based on the facts found in this opinion, the Court unhesitatingly finds and concludes that the Plaintiff has carried his burden of proof.

I

Plaintiff Perry Austin, Jr. was born to Tiffany Bennett on May 29, 1998. A normal baby, he was assigned to the Well Baby Nursery. He and his mother were released from the hospital three days after his birth.

Five weeks later, at 10:28 A.M. on July 4, 1998, Perry Austin's mother brought him to the Emergency Room ("ER") of the Greene County Hospital ("GCH"). He had a fever of 104 degrees Fahrenheit; his mother related to the ER staff that he was "hot" and that he had been

"grunting since this morning." Plaintiff's Exhibit ("PX") 1. The infant was treated by Dr. Anand Pandey, who performed a Throat Strep Screen and CBC. The physician noted that the "[one-month] child [had been] doing well until this [morning, when he] developed [a] fever [of] 104 F." *Id.* The infant had a "mild cough, [and had] vomited." *Id.* Dr. Pandey administered Tylenol. *Id.* He diagnosed Plaintiff's condition as "probable viral fever." *Id.* He then released the child from the Hospital, instructing Ms. Bennett to give Tylenol and sponge baths to the infant if his condition did not improve.

Roughly five hours later, Ms. Bennett returned to GCH's ER with her infant son. She complained that he was suffering from the same problems and that he was constipated. The nurse's notes indicate that the child had a temperature of 101.4 degrees, was "currently grunting," and that when they started taking his temperature, a "watery yellowish stool came out and lower bowel feels full." *Id.* Dr. Pandey again examined Plaintiff. This time his diagnosis was dyspepsia. He prescribed Mylicon drops and half of a Dulcolax suppository. Although he certified that Plaintiff's condition presented an emergency, Dr. Pandey discharged Plaintiff an hour and ten minutes after the infant had been brought to the ER the second time on the same day. *Id.*

On his return home after his second discharge from GCH on July 4, Plaintiff's condition worsened. His mother rushed him to the Druid City Hospital ("DCH") Regional Medical Center, arriving at 10:26 P.M. PX 4.

> On arrival, the child was unconsolable with full anterior fontanelles and poor capillary refill. The Emergency Department Physician started IV. Blood cultures were drawn x 2. Urinalysis was cultured and sensitivities were done. The child was given one 20 cc/kg bolus of normal saline with good response. An LP was then done which showed cloudy fluid. The child was then started on Ampicillin and Clarafan 250 mg each.

*Id.* The antibiotic therapy was administered simultaneously with the administration of the lumbar puncture on the child. The physician's diagnosis of Plaintiff was "Group B Strep meningitis and sepsis." *Id.* The physician advised Plaintiff's parents of the "strong possibility of death or disability" of Plaintiff because of the severity of the meningitis on arrival at DCH.

Plaintiff was then transferred by pediatric trauma unit to the Children's Hospital of Alabama in Birmingham. On arrival at the Children's Hospital, the infant Plaintiff was placed on a ventilator in the Pediatric Intensive Care Unit. When he was discharged from the Hospital some twenty-one days later, the infant Plaintiff had severe brain dysfunction, and atrophic changes in the cerebral cortex and cerebellum. An EEG revealed very low voltage and mild to generalized slowing of brain activity. The Discharge Diagnosis Summary indicates that the infant Plaintiff suffers from encephalomalacia, seizure activity, and paraplegia.

The infant Plaintiff developed brain damage between his first and third visits to medical institutions on July 4, 1998.

As previously noted, antibiotics have the capacity to destroy bacteria within hours, usually via the spinal fluid. Had antibiotics been administered on either of the infant Plaintiff's July 4 visits to GCH, he would not have suffered the severe brain damage which now characterizes his life. *See* PX 15, p. 867; PX 18.

Although the infant Plaintiff displayed the classic symptoms of late-onset group B streptococcal meningitis, Dr. Pandey never ordered a full septic work-up on Plaintiff. Additionally, Plaintiff's fontanelle was never checked, no urine samples were taken, no chest X-ray was performed, and no lumbar puncture was given to the Plaintiff at GCH. Neither was antibiotic treatment ordered by Dr. Pandey. The performance of a complete septic work-up would have revealed whether the infant Plaintiff had meningitis when he presented to GCH.

Dr. Pandey breached the standard of medical care for emergency care physicians in his examination and treatment of Plaintiff by failing to do a significant septic work-up of the five-week-old Plaintiff, by failing to take a blood count or to take blood cultures, by failing to do a urinalysis or to take urine cultures, by failing to do a lumbar puncture, and, most basically, by failing to promptly administer antibiotics. In sum, Dr. Pandey committed medical malpractice by failing to properly diagnose the infant Plaintiff's bacterial meningitis and to provide the appropriate treatment. The Court credits the testimony of Dr. Edmund C. Bolton and Dr. David A. Talan.

Dr. Pandey's breach of the standard of care owed to the infant Plaintiff was the probable and proximate cause of the damages and injuries suffered by the Plaintiff. Put another way, Dr. Pandey's negligence probably caused the injuries suffered by Plaintiff.

For purposes of the FTCA, on all occasions when he examined, cared for, and treated Plaintiff, Dr. Pandey was a federal employee. His salary was paid largely by funds provided by the Department of Health and Human Services' ("HHS") Rural Health Care Program. He was a salaried employee of West Alabama Health Services or Family Health Care while working in the ER at GCH.

II

Plaintiff will suffer severe damages for the rest of his life, as confirmed by the report of United States' expert Dr. Elias G. Chalub. At age four, Perry Austin, Jr. cannot not hear very well, his vision is impaired, and he cannot speak coherently. He does not follow any commands. He engages in self-destructive behavior -- biting, scratching, and hitting himself. He is not bowel or bladder trained. He still wears diapers. He cannot walk. He cannot crawl. He cannot sit for long periods without support. PX 21. He eats only soft foods, and he

occasionally chokes. He has severe microcephaly, severe intellectual and motor retardation, and seizure disorder. *Id.*

Plaintiff has a life expectancy of 67.6 years. PX 11.

Plaintiff's future medical expenses will be $11,261,873 -- the difference between the high and low ranges of the projected cost of funding the Life Care Plan prepared by Plaintiff's expert. The Court found this method to be a reasonable basis for the calculation of such expenses. The future earnings to be lost by Plaintiff as a result of Dr. Pandey's malpractice total $259,000.00. Plaintiff's damages for future pain and suffering, disfigurement, loss of the enjoyment of life, and mental anguish, calculated roughly at the rate of $250 per day, comes to $5.75 million.

To date, Plaintiff has incurred $72,769.38 in hospital bills, which have been paid by Medicaid and to which Medicaid is entitled to subrogation.

For the pain and suffering, disfigurement, and mental anguish Plaintiff has suffered between July 4, 1998, and the date of this opinion, he is entitled to $3 million in damages.

The Court discredits the expert testimony of expert economist Thomas Walsh.

The United States is entitled to a set-off in the amount of $280,000 -- the amount attributable to the Plaintiff as his share of the *pro tanto* settlement with joint tortfeasors in *Perry Austin, Jr. and Tiffanie Bennett v. The Greene County Hospital and Dr. A. Pandey* (Civil Action No. 99-008-EH, Circuit Court of Greene County, Alabama).

III

On June 9, 1999, Plaintiff's attorneys filed an FTCA administrative claim with the Department of Health and Human Services, seeking $5 million in damages. The nature and extent of each injury which formed the basis of the claim was listed as "[p]ermanent brain

damage of Perry Austin, due to negligent failure to diagnose by Dr. Pandy [sic] and Greene County Hospital."

At the time the claim was filed, the infant Plaintiff had not been diagnosed with metatarsus adductus, an inward curvature of the foot. DX 61, Bates 1623. Two months after the claim was filed, Perry Austin was diagnosed as having "fairly significant metatarsus adductus" of his left foot. DX 61, Bates 1573, 1618, 1623. Moreover, at the time of the filing of the claim, Plaintiff and his counsel could not have reasonably discovered the staggering costs of rehabilitation services -- for it was not at all clear that Plaintiff could benefit from such services. Also, Tiffany Bennett learned that the infant Plaintiff had cerebral palsy after the filing of the claim. "The specific type of cerebral palsy often can't be distinguished before [a] child is 18 months old." *Merck Manual of Medical Information* 1312 (Home ed., 1997). Finally, after the administrative claim had been filed, the infant Plaintiff embarked on a pattern of self-destructive behavior. Such behavior was not known, and could not reasonably have been known by Plaintiff's counsel at the time the complaint was filed.

Alabama law on the assessment of future damages has changed since the filing of the claim. At the time the claim was filed, Alabama law required that future damages be reduced to present-day value. Section 6-5-543(b) of the Code of Alabama, originally enacted in 1987, precludes the reduction of future damages to present value. Ala. Code § 6-5-543(b) (2002). However, four years after the statute's enactment, the Alabama Supreme Court held that the statute was unconstitutional. *Clark v. Container Corporation of America, Inc.*, 589 So. 2d 184 (Ala. 1991). It was two years after the administrative claim had been filed in this case when the Alabama Supreme Court virtually ignored *Clark* and, for the first time, held that future damages should not be reduced to present value. *Vaughan et al. v. Oliver,* 822 So. 2d 1163 (Ala. 2001).

Had Alabama law not required that future damages be reduced to present value at the time the claim was filed, Plaintiff's counsel would have filed a substantially larger claim with HHS.

The Court concludes that the increase in the amount of Plaintiff's claim is based on newly discovered evidence not reasonably discoverable at the time Plaintiff's counsel filed the claim with HHS, and it is based on an intervening change in Alabama law on future damages.

## Conclusion

Plaintiff has carried his burden of proof. The evidence clearly shows a breach of the standard of care by Dr. Anand Pandey in his diagnosis and treatment of the infant Plaintiff who was admitted to Greene County Hospital's Emergency Room displaying classic symptoms of late-onset group B strep meningitis. As the direct result of the physician's breach of his duty to accurately diagnose and treat the infant Plaintiff, the child suffers severe and permanent brain dysfunction, seizures, paraplegia, and other disabilities.

An increase in the amount of Plaintiff's claim is justified by newly discovered evidence which reasonably could not have been discovered before the filing of the administrative claim, and by a change in Alabama state law governing the payment of future damages.

By separate order, a Final Judgment shall issue in favor of Plaintiff and against Defendant.

Done this 30th day of September, 2002.

Chief United States District Judge
U.W. Clemon